## J. F. Denniston *v.* S. W. Hill, Appellant.

*Promissory note—Principal and surety—Evidence—Question for jury.*

In a suit upon a promissory note against an accommodation indorser, it appeared that at the time of the indorsement the plaintiff, the holder of the note, had certain property which had been conveyed to him by the maker as security for certain obligations, including the debt for which the note was given. This conveyance had been made before the indorsement of the note in suit which was the last of a series of renewal notes, all indorsed by defendant. The plaintiff with other creditors entered into an agreement to pool the securities held by each of them, and to divide the proceeds thereof pro rata. Plaintiff claimed that defendant knew of this agreement by which the property held as security was turned over to the syndicate before he indorsed the note. The defendant denied that he knew anything about it until the maturity of the note. The testimony tended to show that the property turned into the pool was not sufficient to pay the debt other than the note which the maker owed to plaintiff. The evidence showed that the pool retained the securities for some time, paying the taxes and interest upon a mortgage, and that subsequently a portion of the property was sold at a loss. The whole case was left to the jury, and a verdict and judgment rendered for plaintiff. *Held*, that the judgment should be affirmed.

Argued Jan. 29, 1896. Appeal, No. 216, Oct. T., 1895, by defendant, from judgment of C. P. No. 1, Allegheny Co., Dec. T., 1894, No. 58, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ. Affirmed.

Assumpsit against the accommodation indorser on a promissory note. Before SLAGEL, J.

At the trial it appeared that the note in suit was the last renewal of a series of notes made by F. P. Bell and indorsed by S. W. Hill. The original note was dated November 16, 1892, and was for $4,500. The last note, being the note in suit, was dated March 22, 1894, and was for $3,000. Hill was an accommodation indorser upon all of the notes. In addition to the $3,000 note in suit, Bell borrowed from Denniston, the plaintiff, $15,450, which made Bell's total indebtedness to him $18,450. It did not appear at the trial of this case when Bell borrowed from Denniston the $15,450, nor did it appear what obligations he held for it. By deed dated March 18, 1893, F. P. Bell conveyed to Joseph F. Denniston, the plaintiff, a property, known as the Fahnestock Homestead, situate in the 21st ward, Pittsburg, as collateral security for the $18,450 he owed him, which included the $3,000 note in suit. Bell was indebted to other parties in large sums to whom he had assigned property as collateral security for his debts. Bell had also left with C. C. Davis, cashier of the Central Bank of Pittsburg, the notes of Kenneweg & Co., a solvent firm, composed of F. P. Bell and C. F. Kenneweg, wholesale grocers of Cumberland, Md., to the amount of $40,000. Bell also gave to J. H. White, Esq., a mortgage for $10,000, which was assigned to C. C. Davis, cashier. The $40,000 of Kenneweg & Co. notes and the $10,000 mortgage were left with Davis, cashier, that is, with the Central Bank as collateral security for the whole of Bell's indebtness, including the debt of Mrs. Nannie C. Denniston and Julius Adler, as follows:

| | |
|---|---:|
| Joseph F. Denniston, plaintiff, | $18,450 |
| Mrs. Nannie C. Denniston, | 3,200 |
| Julius Adler, | 2,500 |
| Central Bank, | 26,500 |
| D. P. Reighard, | 21,500 |
| Total, | $72,150 |

On July 15, 1893, the plaintiff and other creditors entered into an agreement to pool the securities held by them, and to divide the proceeds pro rata. Hill claimed that he had no knowledge of this agreement until the note became due. His testimony was, however, contradicted. Among the securities in the pool were the notes of Kenneweg & Co. to the amount of $40,000.

After the making of the agreement of July 15, 1893, but some time before this suit was brought, the firm of Kenneweg & Co. was converted into a corporation with a capital stock of $100,000; and $40,000 par value of the stock was pledged as collateral security for the $40,000 of the notes of Kenneweg & Co., held as security for the indebtedness of $72,150. There was no proof in the case, but the affidavit of defense alleged that the Kenneweg Company corporation was solvent, which was not denied. It did not appear whether the firm of Kenneweg & Co. was solvent or not.

After this suit was brought, but before it was tried, the plaintiff and others, the parties to the agreement of July 15, 1893, sold the Kenneweg notes and stock for $16,000. They had previously received two dividends on the stock of $1,200 each, making the total realized from the notes and stock $18,400.

At the trial of the case Hill, the defendant, claimed that he was discharged by the agreement of July 15, 1893, or that if he was not wholly discharged he was at least discharged to the extent of the proportional value of the securities applicable to his debt, and that in reckoning the value of the securities, the plaintiff and his associates should be charged with the full face value of the Kenneweg & Co. notes and the Kenneweg Company stock, because both companies were solvent.

The court charged as follows:

Starting with the property that was first given over to Major Denniston as security for the indebtedness to him; having that security he had no right to give it up, without the consent of the surety, to his injury. [Major Denniston says that Mr. Hill, before this note that is in suit was indorsed by him, knew about this transaction in relation to the Fahnestock property by which it was turned over to this pool or syndicate, and that he indorsed that note with full knowledge of the circumstances. Colonel Hill denies that and says he did not know it until after this note became due. If he knew it before the note was indorsed by him, and indorsed it with full knowledge of that fact, he would of course have had no right to complain. It would be a substantial assent to the arrangement, and therefore he was not injured.] [9]

But in the view that I take of the matter, I do not think that is a question of any importance. This Fahnestock property which was held by Major Denniston was turned over by

him to what is called the syndicate, under the agreement of the 15th July, 1893, and, as I take it, that was a relinquishment of the security which he held for the indebtedness then owing to him, including this note indorsed by Hill.

That transaction amounted just simply to this, in my view of it. Major Denniston held this Fahnestock property as his individual security. He chose, by this agreement of July 15, 1893, to turn that over to other parties. He could not do that. This arrangement could not have been made, without the assent of Bell, and therefore it was substantially turning that security back to Bell to do with it as he pleased.

I do not see that it made any difference whether he turned it back to Bell absolutely, or whether he turned it back in pursuance of this new arrangement. It was a relinquishment of the Fahnestock property as personal security for himself, in my view of the case, and therefore it would be just the same. He gave it up entirely.

Now, then, what is the effect of that? If that property was sufficient to pay the entire indebtedness of Bell to Denniston, including the note indorsed by Hill, then it would be a complete defense to Denniston's recovery upon this note in this suit. So that there is the first question that you have to consider.

But the testimony here indicates that that property was not sufficient to pay this entire indebtedness. It is not claimed that the property was worth more than $22,000. That was the price that was given by Mr. Fahnestock. I do not think any person testified to its being worth more than that. His testimony was that the house was worth about $15,000, and the lots worth $8,900. If the house was worth $15,000 it would make it about $23,000 or $24,000. But he said the house before the improvements were put on by Bell was worth $10,000. That would only make it about $18,900, and then there were certain improvements put on by Bell. He did not know the value of them, but understood from Bell they were about $5,000; it appears however that the $5,000 was not all improvements upon the property, but included personal matters put in the house by Bell, and therefore probably the fair value of the house would be $22,000. I do not know that any person testified to more than that; I do not remember of any one. But that was sub-

ject to a $13,000 mortgage, which had two years of unpaid interest, as I understand, at the time, which would make about $15,000, leaving about $7,000 as the amount that it would be worth, taking it at its highest value.

Now, did the turning of this over by Denniston to the syndicate injure Hill. Because the mere turning over of the property is not a defense unless it appears that by doing so there was an injury done to the defendant in this case.

For instance, suppose a man has a debt of $10,000, and he has security upon which there is a surety, and also has security for $1,000. The relinquishing of the $1,000 only releases the surety to the extent of that $1,000; and if it was actual money then there would be no question at all about it. But this being property, it is for you to determine whether or not Mr. Hill was injured, and in order to do that you have to find what the amount of this security was. According to my own figuring, taking the $22,000, it would not be worth, at all events, more than $7,000, to Major Denniston.

[Now comes another question. It is claimed here that the defendant, Colonel Hill, is entitled to his proportion of that $7,000, that is supposing that you fix the amount at $7,000. I merely give you that as an illustration.

Say that the security was worth to Denniston $7,000, then Hill would be entitled to his proportion as $3,000 is to $18,450. I do not view the law that way. A person having security for a debt, and having a portion of it secured by a surety, is bound to act in good faith to the surety, but he is not bound to give him the advantages that he has. He is simply bound to treat him fairly, and therefore, if he has a loan as in this case of $18,450, and has a surety for $3,000, of that, and security for $7,000, he is not bound to give that to the surety. He has a right to protect himself, because he has the whole of it as his security. He has not only the collateral, but he has the suretyship of the party to protect himself, unless the property had been given over to him specifically for that indebtness, or including that indebtness for which the surety was liable.

If you believe Major Denniston, this property was not given over to him specifically for this debt at all, but was given to him for another and prior indebtedness, and if he received

money on account of this from Bell in any way he would have a right to appropriate it to the payment of that part for which he had no surety. Therefore, unless the property was sufficient to pay the debt for which Mr. Hill was responsible, he is not injured by this transaction.] [5] I do not know that I can make that any plainer.

I have put it down very clearly, so that if I am wrong in my view of the matter there will be no trouble in understanding what I instructed you to do in this matter.

So that if you find, as you must find according to my view of it, that Major Denniston had this security and did turn it back to Bell practically by turning it over to the pool with his consent for a different purpose, it was a relinquishment of that claim, and then, if there was sufficient over to pay the debt or any part of the debt of Mr. Hill, to the extent that it would have paid it, he is injured, but not otherwise. According to my view of the testimony as to the value of the property and the amount of the indebtedness, it would not have injured him at all.

Then the question of the liability upon the subsequent transaction is a different matter, and I take a little different view of that from either of the counsel for the parties here. You then come to consider this case in view of this agreement. If you find that Hill was not injured at all by the transfer of the property, or the relinquishment of it as we may call it, originally held by Major Denniston for his own private purposes, then you come to consider how Colonel Hill is affected by this agreement of July 15. He says he did not know anything of it until after this note fell due, and after he was asked to pay this note. Major Denniston says he knew it before.

That might be a very important question, in this view, under this agreement, although it has, as I said, no particular bearing upon the other matter because it is not alleged that he knew of this at the time this agreement was made, but assuming that Major Denniston, without his knowledge, turned this property that he held back to Bell practically by turning it over to the syndicate without the knowledge of Mr. Hill, you then come to inquire, as I say, what effect this agreement has. In the first place, I think that Mr. Hill had an interest under this agreement, as I will tell you hereafter. If, however, when he in-

dorsed this last note, the note now in suit, he knew of this agreement and assented to it, then he would only, of course, have his rights under this agreement.

Major Denniston says that prior to the making of the note in suit a note had been protested, and that he then saw Mr. Hill and told him about this arrangement that had been made, explained it to him, told him he could see a copy of it if he wanted to, and that with full knowledge of that Mr Hill indorsed this note; Mr. Hill says, as I told you before, that he did not know of it until after this note became due, and when demand for payment was made that he then first knew of this agreement. I do not suppose any person would suppose for a moment that either of these gentlemen is testifying falsely, knowingly falsely.

There may be a mistake, there is a mistake by one of them as to the time when the conversation occurred. They both practically admit such conversation did occur, and the only question is when, whether it was before this note became due or whether it was afterwards. But still, as I said in the first instance, that may be an important question, or it may be of no importance, because, if Mr. Hill was not injured by the original transfer, then he comes under this agreement, and whether he knew it or not he is entitled to whatever rights he may have under this agreement.

We come now to the consideration of that. This agreement recites that Bell was indebted to Denniston $18,450, including this $3,000 note; that he owed Mrs. Denniston $3,200; he owed the bank $26,500; he owed Adler $2,500; he owed Reighard as indorser $21,500; making a total of $72,150, including this $3,000 note indorsed by Hill. Now whether this statement, " Whereas Denniston holds as security for a portion of said indebtedness a deed of property," whether that refers to the fact that he only had security for a portion of said indebtedness due to him, or whether it refers to a portion of the entire indebtedness of $72,150 is a matter that is not, it seems to me, material, because the entire indebtedness fixed by this agreement is $72,150. It is not disputed that that includes the note indorsed by Hill. It recites all of the other liabilities and securities, and then comes the agreement upon which there is some difference of opinion, and as to which I differ from counsel somewhat:

"Whereas, in further security of all of said indebtedness"—
that means all the entire $72,150—"and indorsements, said Bell
has turned over to C. C. Davis, cashier of the bank aforesaid,
notes," etc., these Kenneweg notes and the $10,000 mortgage.
It is insisted by counsel that that means that prior to the mak-
ing of this agreement he had turned these notes over, the Ken-
neweg notes and the stock, etc., and the mortgage. I do not so
understand it. I think that this agreement is entirely con-
sistent with the testimony of Mr. Reighard and Major Dennis-
ton that those were turned over in pursuance of this agreement.
That is, it was a part of the agreement, and although it may
have been turned over a minute, or a day, or two or three days,
before the paper was actually signed, it was a part of this nego-
tiation, because all the negotiations leading up to an agreement
are a part of it. Therefore, this agreement does not show that
this was turned over to them prior to and independently of this
arrangement. In my judgment, and under the testimony of
Mr. Reighard and Mr. Denniston it was a part of the same
transaction. But however it was turned over, it was turned
over as security for the entire indebtedness, including the $3,000
note, and therefore Hill had an interest in that, just as much as
the others.

Although he was not a party to the agreement he had an
interest in it, because Major Denniston, who held him as surety,
had this security received from Bell in connection with these
other parties, and to that extent Hill was interested in this
agreement. I do not understand either that these parties under
this agreement did not all give up their individual security just
as Major Denniston did. They agreed to pool them all, and
this was done with the consent of Bell, and could not have
been done without his consent, because they had no right to
use property put in their hands for security for any other pur-
pose than what he gave it to them for.

So that you have this agreement, by which Denniston held,
as security for this note, his interest in this agreement. He
put in whatever he had in that Fahnestock property, and he
got not only that but an interest in all the other securities that
these parties had to protect himself, including this $3,000 note.
Did he do anything in that at all that worked an injury to Mr.
Hill as to his suretyship on this note? If he did, to that ex-

tent, to the extent of the injury done through anything done by Mr. Denniston, it is a defense to his note. There comes the last question in the case, as I understand it.

It is not claimed that any of the properties have been interfered with except the Kenneweg notes. The Fahnestock property, the Chicago property, and the Penn avenue property all remain in the same shape, except this. In the Penn avenue property they had a mortgage upon the property simply. That had been foreclosed and they took the property instead of their mortgage ; but it does not change their relations, except that they have got now a title to the property instead of holding it subject to a mere mortgage. That is no material alteration of their position in relation to it, it betters their position, in fact. But in order to do so they had to pay some $1,800, I think Mr. White testified, in order to get that property.

By Mr. Imbrie: Two thousand eight hundred dollars. By the Court: Two thousand eight hundred dollars, or whatever it was. They have kept the other properties, and of course they have had to pay the taxes; they have had to pay the interest upon the mortgage against the Fahnestock property; they had to pay certain taxes etc., upon the property in Illinois.

Was that wrong, is the first question. Was it wrong for them to do that? We all know the condition of affairs since 1893. This property was turned over to them in 1893 in July, and we all know the depression in business of all sorts, and especially in real estate. Was it a wise thing or was it an unwise thing for them to hold this property even at an expense, with the view of realizing upon a rising market? Or ought they to have disposed of it at once and taken the sacrifice, whatever there might have been in it? If they acted as prudent men would have acted, then they certainly cannot be held responsible for any misfortune that would arise, because where a man acts honestly with the best intentions for himself, he being the first interested, a person who is incidentally interested certainly has no right to complain.

That may have an influence upon the real question in this branch of the case. It is alleged that they have disposed of the Kenneweg notes, and that they have made a large loss upon those notes, and that this was done with the consent of Major Denniston. It is claimed that this property is in the hands of

a trustee, and that Davis was the trustee, but it seems, by the testimony that Mr. Ridall has charge of this in some way as trustee or manager. He is not strictly a trustee, he is rather the agent of these parties. But it appears that this transaction in relation to the Kenneweg notes was transacted with the knowledge, and I believe with the active participation of Major Denniston; because he testifies that after this property was acquired, one share of it was given to him and one to Ridall, in order to enable them to act as directors of the corporation. He says they did act, that they investigated the matter and finally disposed of the property, and as I understand, it was disposed of upon the recommendation of Major Denniston himself. At all events, I do not see that he is not responsible with the others for any mismanagement in that respect, and therefore you come down to inquire whether or not the evidence shows that there was any mismanagement to the injury of the defendant in this case. If there was, then to the extent of that injury he would have a defense to this note.

[They received for that $16,000, $8,000 being in cash, and they received two dividends amounting to $1,200 each; over $10,000 received out of this Kenneweg investment. They did not appropriate that to the payment of these liabilities as they had a right to do, that is the payment of the $72,150; but they used it in paying liabilities upon these different properties which they own, and which are held for the general benefit of all.

As I have said before, was that wise, was it prudent and proper for them to use it? If it was, then there can be no claim upon that account.

If a prudent business man would have used the money in the same way to preserve his real estate until a better market could be afforded, then they have done the defendant no injury. But it is said they sold it for a great deal less than it was worth, that the pleadings here show that Kenneweg & Co. and the Kenneweg corporation were solvent.

I believe that the affidavit of defense does not state that Kenneweg was solvent, it alleges that the corporation was solvent, and is solvent to-day, but there is no allegation and no proof in the case.

By Mr. Duff: There is proof that Kenneweg is solvent.

By the Court: I do not remember it. If there was, that is a

fact that you will consider. I do not remember any evidence as to the condition of Kenneweg himself, but the affidavits allege, and it is not denied, that the corporation is solvent.

The plaintiff testifies that after they had these notes for some time they employed an accountant to go through the business of the company, and they themselves went to Cumberland and inquired into the condition of affairs, and after a full examination they were satisfied that it was a question whether the corporation would continue at all, that it could not in their judgment, without further capital, and they were not in position to put in capital, that they thereupon sold this interest for $16,000, $24,000 less than its face value.

I do not consider the law to be that in a case of that sort the plaintiff is bound to account for the full face value of this security. He has only to account for what its real value was, whatever it may have been, and it is for you to determine what the real value was. If it was worth more than $16,000 and they ought to have known it and ought to have received more than $16,000, then they are responsible for the difference, and the defendant here would be entitled to his proportion of that difference, as a credit upon this note. For instance, suppose that it was worth its face value, there would be $24,000 of a loss on that security which was made with the consent of Major Denniston. That would be one third of the $72,000, and therefore Colonel Hill would be entitled to a credit of one third upon this note, which was secured, as I have instructed you, by this agreement, because Major Denniston had allowed this $24,000 to go out of his control. If it was less than that, if they got out of it all that they reasonably could be expected to get out of it, then of course it is no defense because Mr. Hill was not injured. But if it was anywhere between, if they ought to have received anything between the $16,000 and the $40,000, he would be entitled to his one third of that, that is one third of the $3,000.] [6]

Verdict and judgment for plaintiff for $3,145.52. Defendant appealed.

*Errors assigned,* among others, were (5, 6, 9) portions of charge as above, quoting them.

*Levi Bird Duff,* for appellant.—Any dealing by the creditor with the debtor which amounts to a departure from the contract

discharges the surety: Finney v. Com., 1 P. & W. 240 ; Holt
v. Bodey, 18 Pa. 207 ; Boschert v. Brown, 72 Pa. 372; Polak
v. Everett, 1 Q. B. Div. 669.

If the creditor relinquishes any security which he holds for
the debt, or disposes of any collateral put up by the debtor, the
surety is discharged pro tanto : Brandt on Suretyship, sec. 426,
et sequitur.

*A. M. Imbrie,* for appellee.—The pledgee is only bound to
use diligent efforts to obtain a fair, reasonable price for the
property pledged: Bank v. Glue Co., 164 Pa. 1.

The doctrine of substitution only applies where the principal
has been wholly paid.  It cannot be permitted when he has
been paid in part only: Bank v. Potius, 10 Watts, 148 ; Kyner
v. Kyner, 6 Watts, 221 ; Ins. Co. v. Fidelity Co., 123 Pa. 523 ;
Forest Oil Co. App., 118 Pa. 138; Rice v. Morris, 82 Ind. 204;
24 Am. & Eng. Ency. of Law, 820 ; Colebrooke on Col. Secur-
ities, 255.

PER CURIAM, February 17, 1896 :

This case involved questions of fact which were properly sub-
mitted to the jury with substantially correct and adequate in-
structions as to the law relating thereto.   Their verdict for the
plaintiff necessarily implies a finding of all the material facts
in his favor; and, unless the learned trial judge erred in one or
more of the particulars complained of, the judgment should not
be disturbed.

There is no complaint as to the admission or rejection of tes-
timony.   One of the errors alleged is the affirmance of plain-
tiff's fifth request for instructions.   Five of the others are the
refusal of the court to affirm defendant's requests for instruc-
tions, recited therein respectively ; and the remaining three are
to portions of the learned judge's general charge.   Our exami-
nation of the record has not convinced us that any of these
specifications should be sustained; nor do we think that either
of them requires discussion.   As to the question, whether the
defendant indorsed the note in suit with knowledge of the cir-
cumstances connected with the transfer of certain property, etc.,
to the so-called syndicate, the testimony was conflicting, but
we think it was sufficient to justify the submission of that ques-

tion to the jury as was done in that part of the charge recited
in the 9th specification of error.    Referring to that transaction
the learned judge said, inter alia : " If he (the defendant) knew
it before the note was indorsed by him, and indorsed it with
full knowledge of that fact, he would, of course, have no right
to complain.    It would be a substantial assent to the arrange-
ment, and therefore he was not injured."    There is nothing in
this, or in any of the instructions to the jury, of which the
defendant has just reason to complain.    Neither of the assign-
ments of error is sustained.

 Judgment affirmed.