Gildner, Trustee, Appellant, *v.* First National
Bank and Trust Company of Bethlehem.

Argued April 28, 1941. Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

146

*William S. Hudders,* with him *Calvin F. Smith,* for appellant.

*Robert T. McCracken,* with him *George G. Chandler* and *Taylor, Schrader & Riskin,* for appellee.

Opinion by Mr. Justice Maxey, May 13, 1941:

This is an appeal from the decree of the Court of Common Pleas of Northampton County dismissing plaintiff's bill for a discovery and an accounting, and for damages for alleged neglect in selling certain collateral.

The litigation arises out of the tangled financial relations beginning sixteen years ago of two individuals, now deceased, with each other and with a bank, now defunct. The individuals were Aaron Potruch, who died insolvent on December 27, 1933; Lawrence H. Rupp, who died insolvent on September 11, 1936 (the trustee of his bankrupt estate is the appellant) ; and "the bank" (and hereinafter so referred to) was the Lehigh Valley National Bank of Bethlehem, which on July 4, 1932, was "absorbed" by the appellee, the First National Bank and Trust Company of Bethlehem, the latter taking over all of the former's assets and assuming all of its liabilities. Potruch as maker had discounted many notes at the bank and Rupp had frequently been his endorser.

The controversy arises over the disposition of the proceeds, $29,500, of a collateral "second mortgage" (herein referred to as "the collateral") for $47,000 on the Globe Theatre and Wyandotte Hotel property

(a single property) owned by Potruch and located in Bethlehem. Appellant claims that after a note of Potruch's, endorsed by Rupp, for $7,500 and discounted at the bank, was paid out of these proceeds, the appellant should have been subrogated to the bank's rights in that collateral so liquidated. Appellee claims that the collateral was properly used to pay Potruch's obligations at the bank. The basic question thus becomes: Was the colateral *restricted* to the notes endorsed by Rupp or was it *general* collateral security for all of Potruch's notes at the bank?

The collateral was on November 17, 1926, delivered to the bank. It was sold at private sale by the appellee to the Mitten Bank Securities Corporation on September 16, 1936, for $29,500. The sum realized from the sale of this $47,000 mortgage was applied as follows: (A) $7,500 to the payment of a note of Maxwell Potruch (Aaron's son), in that amount, dated June 14, 1935, which Rupp had endorsed and which replaced the prior Rupp endorsed note of Aaron Potruch. (B) The notes of Aaron Potruch for $16,500 and $5,000, respectively. (C) A $500.00 note of Maxwell Potruch made and endorsed by him at the request of the bank for accommodation upon his voluntary assumption of the debts at the bank of his then deceased father.

The chronology of material events is as follows: In November and December, 1925, Potruch borrowed $50,000 from the Lehigh Valley National Bank on four notes endorsed by Rupp. Shortly thereafter this indebtedness was reduced to $47,000. On November 1, 1926, the bank's Board of Directors notified Potruch and Rupp that it would not renew these notes unless they were covered by sufficient collateral. The minutes of the bank show that on November 8, 1926, "on proper motion made, seconded and carried the cashier was authorized to secure from Aaron Potruch a mortgage for $47,000 to cover the amount of indebtedness with us, which mortgage is to be used as security in addition

to the endorsement of Lawrence H. Rupp." On November 17, 1926, the Board of Directors of the bank accepted the second mortgage for $47,000 as collateral for these notes, in addition to Rupp's endorsement. The first mortgage on the property was in the amount of $65,000. The second mortgage for $47,000 is in the usual form and does not make any reference to the fact that it was given as collateral security for the obligations. At the time this mortgage was given, Potruch was indebted to the bank in the sum of $17,921.29 *on other obligations to which Rupp was not a party.* This indebtedness continued in excess of $20,000 thereafter. The Rupp endorsed notes of Potruch, which aggregated $47,000 on November 17, 1926, were reduced to $29,000 by December 3, 1931. Potruch's total indebtedness to the Lehigh Valley National Bank on December 3, 1931, was $59,220. In this total are included $16,500 borrowed in February, 1928, and $5,000 borrowed in May, 1928. Under date of April 10, 1931, the bank entered the second mortgage for $47,000 upon a collateral register sheet, in that bank, signed by Aaron Potruch and bearing his endorsement as follows: "For value I assign the following as collateral subject to all the provisions relating thereto in my notes now or hereafter given to Lehigh Valley National Bank, Bethlehem, Pa." On October 14, 1931, Potruch executed and delivered to the bank his demand renewal note for $5,000 and on July 7, 1932, a similar note for $16,500, and he specifically pledged as collateral security for the payment of these notes and of any other liability or liabilities to the holder thereof, due or to become due, or that might be thereafter contracted, whether direct or contingent, or whether now or thereafter acquired, "the collateral described on collateral leaf bearing payor's signature." In this "described collateral" was the above mentioned $47,000 mortgage. *Rupp was not liable on* any of these notes in the amounts of $16,500, $5,000, and $500, respectively.

Potruch completed the construction of the Globe Theatre at about the time the $47,000 mortgage was given and he continued as the owner of it and of the Wyandotte Hotel until June 19, 1929, when he conveyed it to Rupp and Morris Black as Trustees for his creditors. This was done because, as Maxwell Potruch testified, his father (Aaron Potruch), although insolvent, wished to avoid bankruptcy. Shortly afterwards, the Globe Theatre was conveyed by the Trustees to the Livingston Realty Company, a corporation formed for the protection of the creditors of Aaron Potruch. These creditors comprised all of the stockholders of this realty company. During the time that Potruch had control of the theatre, the rents amounting to $25,000 annually were turned over after November 17, 1926, for two years to Rupp, who deposited them to his own account. Rupp received from this source at least $50,000. Why Rupp received this is not clear. Maxwell Potruch testified: "We gave him (Rupp) this money due to the fact that he endorsed our notes and we were obligated to him for the money." He later added: "My father used to give him certain amounts of money for helping him finance these projects and my father gave him the money and the loan in return for the moneys he had given and endorsements to protect him." There is no proof that the $50,000 turned over to Rupp in 1927 and 1928 was related to the payments Rupp made on the Potruch notes from 1931 to 1936,[1] which reduced the Potruch indebtedness to the bank on which Rupp was liable as endorser to *$7,500.* On December 3, 1931, this indebtedness had been $29,000. On it Rupp paid to the bank between December 3, 1931, and June 15, 1932, the sum of $12,000. From July 4, 1932, to February 27, 1936, Rupp paid on this Potruch indebtedness, in-

---

[1] Potruch and Rupp had been engaged in many building and financial transactions between 1927 and 1929. They constructed from sixteen to thirty-two houses each year. About $100,000 a year was required to finance these constructions.

cluding payments of principal and interest, a sum "in excess of $11,900."

·The basic findings of fact of the court below are (in condensed form) the following: 5. On November 17, 1926, Potruch executed and delivered the $47,000 bond, and mortgage to the bank "as additional collateral security for all his obligations and indebtedness and the said bond and mortgage were so accepted by Cashier Snyder for the bank." They "are absolute on their face and are recorded in the office of the Recorder of Deeds for Northampton County in Mortgage Book 346 at page 96. They were placed in the bank's cash vault and were marked as additional collateral for notes of Aaron Potruch." 6. No officer or director of the bank "knew or was ever told by Aaron Potruch or Lawrence H. Rupp of any restriction upon the said bond and mortgage and their use as general collateral security for all the obligations and indebtednesses of Potruch with the bank." The 9th finding is in accord with our statement above made about the entry of the $47,000 mortgage upon the bank's collateral register sheet, and the endorsement on that sheet, signed by Potruch. The 12th finding is in accord with our statement above made about Potruch's demand renewal note for $5,000 and his specific pledge of the $47,000 mortgage as collateral for "the payment of said note and of any other liability or liabilities to the holder thereof, due or to become due, . . . direct or contingent or whether now or thereafter acquired." The 16th finding is in accord with our statement above made about Potruch's demand renewal note for $16,500 and his specific pledge of the $47,000 mortgage as collateral for "the payment of said note and of any other liability or liabilities to the holder thereof, due or to become due".

The court below set out the following conclusions of law: "1. The $47,000 second mortgage on the Globe Theatre and Wyandotte Hotel property was held by the Lehigh Valley National Bank as general collateral

security for all the obligations and indebtednesses of Aaron Potruch with the bank. 2. Under the take-over agreement of July 4, 1932, and the assignment of even date, The First National Bank and Trust Company of Bethlehem acquired as pledgee all the assets of the Lehigh Valley National Bank including the obligations and indebtednesses of Aaron Potruch and the collateral security therefor. . . . 4. Unless and until all of the obligations and indebtednesses of Aaron Potruch with the Lehigh Valley National Bank and the First National Bank and Trust Company of Bethlehem, pledgee, have been paid in full there was and could be no right of subrogation in the collateral security including the said Second Mortgage for the said obligations and indebtednesses in Lawrence H. Rupp or his bankrupt estate. 5. Under the findings of fact in this case both Lawrence H. Rupp and his bankrupt estate are now estopped from asserting any claim or interest in the proceeds from the sale of the said Second Mortgage by any alleged special pledge or other arrangement between the Lehigh Valley National Bank, Aaron Potruch and Lawrence H. Rupp. 6. In any accounting between the plaintiff and the defendant, the admitted claim of $36,800 against the bankrupt estate of Lawrence H. Rupp may be set off as a credit by the defendant. 7. The present bill should be dismissed with costs to the defendant."

It is the contention of appellant that the appellee "failed to realize an adequate and sufficient sum when it sold the $47,000 mortgage for $29,500" and it was negligent in failing to obtain a sum which would have been adequate "to pay the balance of $7,500 remaining due" on the Potruch-Rupp notes "and such additional sum as would reimburse" the appellant "for such sums of money which the said L. H. Rupp paid in liquidation of the maker's [Potruch's] indebtedness upon the said note or notes." Appellant contends further that "at the time the mortgage for $47,000 was delivered" to

the bank, i. e., on November 17, 1926, as collateral for the note or notes of Aaron Potruch in like amount at the said bank, there was created a trust relationship whereby the bank "held the collateral so pledged, first, to pay the obligations for which it was pledged and thereafter to reimburse the said Lawrence H. Rupp, the endorser, upon such obligations to the extent that he might be called upon to pay the liability of the maker thereof." Appellant claims that "upon the assignment of the said obligation or obligations of Aaron Potruch endorsed by L. H. Rupp, the defendant herein not only became the assignee thereof, together with the collateral pertaining thereto, but also succeeded to, and had notice of, the trust relationship between the said Lehigh Valley National Bank of Bethlehem and the said L. H. Rupp," and "that in addition to the negligence of the defendant as trustee in failing to realize a sum adequate to reimburse the said L. H. Rupp for monies paid on the aforesaid note or notes to the said Lehigh Valley National Bank of Bethlehem and to the defendant as heretofore recited, the defendant was guilty of breaches of trust consisting of: a. wilfully converting the excess realized from the sale of the said collateral to other obligations owing unto it in spite of its duty to your orator as trustee of L. H. Rupp; b. of supine negligence in diverting the excess proceeds from the sale of the said collateral to other obligations owing to it from Aaron Potruch and Maxwell A. Potruch without authority therefor; c. of negligence in diverting the excess proceeds of the sale of said collateral to other obligations of the said Aaron Potruch and Maxwell A. Potruch without authority to do so; d. selling the said collateral at private sale; and e. selling the said collateral without notice to your orator." Appellant (i. e., plaintiff below) pleads in his bill that "by reason of the aforesaid negligence and breaches of trust" he "demands interest as damages upon such sum or sums of money which

he is entitled to receive from the date of the sale of the aforesaid collateral, to wit, September 16, 1936."

If the court's findings of fact are supported by competent evidence, appellant's contentions (just recited) must be negatived. They are so supported by evidence, which may be summarized as follows:

1. The collateral is absolute in substance and in form and is not restricted to any specific notes or obligations.

2. The statements signed by Potruch on the bank's collateral register and also his statements (supra) in connection with the $5,000 and $16,500 demand renewal notes.

Appellant calls attention to the fact that the collateral register was signed by Potruch on June 19, 1928, "the date of the first entry". Appellant says: "Although the $47,000 mortgage was acquired by" the bank "on November 17, 1926, it was not entered as general collateral on Potruch's collateral register until '4-10-31' or four months before the bank started clamoring to Rupp for reductions. Rupp was not a party to this collateral register and never waived his rights or equities in the $47,000 mortgage as collateral for his endorsements".

We fail to see what "rights or equities" Rupp ever had in the $47,000 mortgage which he could either "waive" or assert. His original endorsements of Potruch's notes at the bank *antedated* by about one year the delivery of the collateral to the bank; therefore, these endorsements were in no degree induced by the delivery of this collateral. This record is barren of any express agreement between the bank and Rupp in respect to this collateral and under the facts here present no agreement between the bank and Rupp in regards to this collateral arises by implication of law. The presumption is that the collateral was what it prima facie *purported* to be, that is, collateral general in character and applicable to all of Potruch's obligations at

the bank. The burden of proving otherwise was on the appellant. The creditor's (i. e., the bank's) rights to this collateral was superior to Rupp's. It is axiomatic that "subrogation . . . . will never be allowed to the prejudice and injury of the creditor" and that "until the creditor has been fully paid, substitution or subrogation cannot take place upon any terms whatever": *Musgrave v. Dickson et al.,* 172 Pa. 629, 33 A. 705; *Forest Oil Co.'s Appeals,* 118 Pa. 138, 145, 12 A. 442; *Kyner v. Kyner,* 6 Watts 221. See also *Denniston v. Hill,* 173 Pa. 633, 34 A. 452.

Further proof of the fact that the $47,000 collateral was delivered to the bank as security to all of Potruch's obligations at the bank and not merely as collateral to those obligations of Potruch on which Rupp was contingently liable, is found in the testimony of Maxwell Potruch, who as a witness stated that when his father was "called upon to give this $47,000 mortgage" he was indebted to the bank in the sum of "over $20,000". He was asked: "What, if anything, was said by your father or Mr. Snyder in your presence with respect to the extent of the security which that mortgage was given to cover?" He replied: "There was nothing said; we just gave this mortgage. Mr. Snyder had been after us to reduce, had made demands on us to reduce our notes; and we were not in a position to do it because we were trying to refinance this theatre, and when he had asked us for additional collateral, we had given him this second mortgage of $47,000.00 and Mr. Snyder [the bank's cashier] took that."

Appellant contends that the minutes of the Board of Directors of the bank show that the collateral was *intended* to be restricted to the Potruch-Rupp obligations. These minutes (supra) show that the bank directors on November 1, 1926, notified Potruch and Rupp that the notes of the former endorsed by the latter would not be renewed "unless same are covered by satisfactory collateral". This does indicate that the directors were

impelled to demand this collateral by a consideration of the weak position of the Rupp endorsed notes of Potruch. But when the collateral *as given and received was in no way restricted* to any particular obligations, the bank had the undoubted right to accept it *in exactly the form Potruch offered it.* The minutes of the Board of Directors do not "clearly demonstrate" (as appellant alleges) "that the aforesaid mortgage was specially pledged for the" Potruch-Rupp indebtedness. The minutes of the November 8, 1926, meeting of the Board (supra) show that the cashier (now deceased) was authorized "to secure" from Potruch this collateral "to cover the amount of indebtedness with us." That it was to be used as security "in addition to" the Rupp endorsement does not prove that its *sole legal function* was to fortify that endorsement.

But the minutes are not appellee's only reliance. R. E. Wilbur, president of the bank contemporaneously with the events recited, testified that "nothing was said by Potruch at the time the mortgage was given to the bank that the mortgage was restricted to any particular use." The court below found that "no officer or director of the First National Bank & Trust Company of Bethlehem knew or was ever told by Aaron Potruch or Lawrence H. Rupp or any officer or director of the Lehigh Valley National Bank of any restrictions upon the said bond and mortgage and their use as general collateral security for all the obligations and indebtednesses of Potruch. The first notice of such a claim came from counsel for the plaintiff in June, 1938."

It is true, as pointed out by appellant, that Rupp from time to time on and after October 26, 1931, claimed rights in this collateral. In a letter bearing the date just mentioned Rupp wrote the bank, inter alia, as follows: "At the time these reductions [in the Potruch indebtedness to $31,500 by payments made by Rupp] were made I did not require any assignment to me of any portion of the collateral which you held, for the

reason that I know that when the whole indebtedness was paid off I would be subrogated in right to the collateral." The bank replied to this letter, under date of October 30, 1931, inter alia, as follows: "You must realize that any understanding you had with Mr. Potruch regarding the $47,000 mortgage or the Globe Theatre as a whole was not known to the bank and therefore is not binding on us." There was other later correspondence of similar tenor. It is obvious that Rupp's belief as to his rights in this collateral or his "demand" that his alleged right in this collateral be recognized by the bank, does not in any degree affect the legal status of this collateral.

Appellant asks: "If there were other Potruch notes at that time, and it seems there were some $17,921.29 of them, why was this mortgage written in the exact amount of the Rupp line, namely, $47,000? The mortgage was on Potruch's theatre and created in response to the bank's demand. If the intent was to make it collateral for all debts, would it not have been most naturally in the amount of $47,000 plus $17,921.29 or $64,921.29?"

It can be conceded that the Potruch-Rupp obligations of $47,000 at the bank and their weak position in respect to security is what precipitated the demand for this collateral, but it does not follow from this that the collateral is therefore restricted in its application to the indebtedness which initiated the action which brought it into being.

There is no evidence that Rupp was prejudiced by Potruch's delivery of this mortgage as general collateral for his obligations to the bank or that the bank did anything to mislead Rupp into the belief that for anything he paid on the obligations secured by the collateral he would be subrogated to the creditor's rights in respect thereto. His original assumption of liability for Potruch's obligations at the bank long antedated the delivery of the collateral (as already noted) and Rupp's

subsequent endorsement of Potruch's renewal notes evidencing the same indebtedness gave him no rights superior to the creditor bank in respect to that unrestricted collateral. "Subrogation rests upon purely equitable grounds and it will not be enforced against superior equities": *Musgrave v. Dickson et al.*, 172 Pa. 629, 33 A. 705 (supra). "The doctrine of substitution is one of mere equity and benevolence and will not be enforced at the expense of a legal right": *Fink v. Mahaffy*, 8 Watts 384. The doctrine of subrogation was adopted from the civil law and is based not on contract but on considerations of equity and good conscience: *Young v. Vough*, 23 N. J. Eq., 325, 329; *Ætna Ins. Co. v. Middleport*, 124 U. S. 534, 548. "The doctrine of subrogation is a device to promote justice. We shall never handle it unwisely if that purpose controls the effort, and the resulting equity is kept in view": *Acer v. Hotchkiss*, 97 N. Y. 395, 402. All the cases show that subrogation is granted as a means of placing the ultimate burden of the debt upon the person who should bear it. The law gives the creditor the right to enforce the payment of the debt due him in whatever way is legitimately open to him, and equity never attempts prejudicially to interfere with the creditor's exercise of his legal right. If when Rupp paid the bank between March 3, 1931, and February 27, 1936, the sum of $23,970.08 on account of principal and interest on the Potruch notes endorsed by Rupp, Potruch's obligations to the bank had thereby become *wholly extinguished, equity* would treat this debt so "paid", *as not paid and thus extinguished,* but *as purchased by him* (Rupp), and then he could proceed by way of subrogation against the collateral, which in that contingency would be held by the creditor bank not for its own benefit but for the benefit of the surety. But since Potruch owed the bank as much as was realized from the sale of the collateral and since the collateral was unrestricted, and since Rupp had with the bank no contract, either ex-

press or implied, that any part of the proceeds of this collateral would be used to reimburse him for what he had paid on the Potruch-Rupp obligations, it follows that the appellant as successor to Rupp's rights, has no standing to ask a court of equity as a matter of "benevolence and good conscience" to enforce his claim of subrogation in respect to any part of the proceeds of this collateral at the expense of appellee's clear legal right to such proceeds.[2]

In view of our conclusion on the merits, it is unnecessary to discuss the finding of the court below that the appellant is guilty of laches. However, the long period of inaction does indicate that both Rupp and the appellant had little faith in their claim. Rupp was notified on November 18, 1931, by E. W. Cromwell, Vice-President of the bank, as follows: "We must again remind you that this mortgage was secured by the bank to protect themselves for any liability over and above the indebtedness covered by what we felt were strong endorsements such as your own and the present emergency in the affairs of Mr. Potruch shows the wisdom of that action. If we were to surrender any of our rights at the present time it would not only be bad business on our part but we would be subject to very strong criticism from the National Bank Examiner." Rupp lived four years, five months and eleven days after the receipt of this letter and though he was an able attorney fully cognizant of all his legal rights, he instituted no action against the bank. Appellant became the successor to all of Rupp's legal rights in respect to this collateral on July 23, 1936, (when he was appointed trustee of his bankrupt estate) and he did not file this bill until September 15, 1939. The collateral was sold on September 16, 1936. The court below appropriately

---

[2] "The surety is entitled upon such tender [i. e., to the creditor of the amount of the debt] to a surrender *only* of securities which were deposited *for the particular debt for which he is surety*" (italics supplied): 50 C. J. p. 237.

quoted what this court said in *Grange Nat. Bank of McKean County v. First Nat. Bk. of Bradford et al.*, 330 Pa. 1, 198 A. 321, as follows: "Laches bar relief in equity whenever in the chancellor's discretion a party has by his delay disentitled himself to the unusual remedies equity affords to those who deserve them: *Riley v. Boynton Coal Co.*, 305 Pa. 362, 157 A. 794; *Kinter v. Commonwealth Trust Co.*, 274 Pa. 436, 118 A. 392."

Appellant's 7th assignment of error is based on the admission, over objection, of the testimony of Maxwell Potruch. The argument is that this witness was "a surviving party to a thing or contract in action between himself and Rupp. By reason of the bank's application of the proceeds of the collateral which is the basis of plaintiff's complaint, Maxwell Potruch's liability on these notes was terminated. Obviously, it is to his interest to keep matters in that state and save himself an action by the bank on these obligations if the bank loses this action."

Maxwell Potruch is not a "survivor" testifying to a transaction with a deceased opponent. He has "no disqualifying vested interest in this suit, though he may have an interest in the question involved": *Metcalf v. Buck*, 36 Pa. Superior Ct. 58. "To effect this disqualification [i. e., of clause (e), sec. 5 of the Act of May 23, 1887, P. L. 158], the interest of the surviving party must be adverse to that of the deceased" in the particular case trying and not in its possible results: *Weaver, Exr., v. Welsh*, 325 Pa. 571, 577, 191 A. 3. Whatever the decree in the instant case, this witness will be neither burdened nor benefited by *it*. Here two creditors are litigating over the proceeds of the sale of collateral. That this witness might eventually profit if the appellee succeeded, for thereby the possibility of his being called upon to pay his $500 note to the appellee, is an interest affecting his credibility but not his competency. A disqualifying interest is one which the judgment in the case would operate on: *Dickson et ux. v. McGraw Bros.*,

151 Pa. 98, 24 A. 1043. See also *Bank v. Henning*, 171 Pa. 399, 33 A. 335. This assignment of error is overruled.

We find no basis for the claim that the defendant was "negligent in failing to realize a sum" by the sale of the collateral "adequate to reimburse" Rupp "for monies paid on the notes to the" bank and was "guilty of breaches of trust" in selling the collateral "without authority at private sale, without notice" to appellant. The sale of this collateral appears to have been handled with fidelity and skill. The appellee on September 16, 1936, sold this collateral *after* it, as the then owner of the first mortgage of $65,000 on the same property as the one on which the $47,000 collateral was a second lien, agreed with the purchaser, the Mitten Bank Securities Corporation, that the first mortgage would not be foreclosed for at least five years thereafter.

The decree is affirmed, at the appellant's cost.